**MULTI–MEDIA DISTRIBUTING CO., INC., a/k/a Leisure Time Entertainment, Inc., d/b/a Leisure Time Products, Inc., Plaintiff,**

v.

**UNITED STATES of America, for Defendant.**

**Civ. No. H 93–196.**

United States District Court, N.D. Indiana, Hammond Division.

Oct. 28, 1993.

**608**

David J. Hensel, Indianapolis, IN, Herald Fahringer and Diarmuid White, New York City, Arthur Schwartz, Denver, CO, for plaintiff.

Terry M. Cushing, Asst. U.S. Atty., Louisville, KY, Elizabeth L. Homer, Washington, DC, for defendant.

### ORDER

MOODY, District Judge.

This matter comes before the court upon the motion of Multi–Media Distributing Co. [hereinafter "Multi–Media"] for return of property under Rule 41(e) of the Federal Rules of Criminal Procedure. On May 13, 1993, the United States executed a search warrant at Multi–Media's Merrillville, Indiana facility. Among the items seized at that time were two copies each of eighty-six allegedly obscene video cassettes and nine allegedly obscene magazines. A partial copy of Multi–Media's customer list was also seized. Multi–Media argues that these seizures violated its rights under the Fourth and First Amendments to the United States Constitution. The court disagrees that Multi–Media's Fourth Amendment rights have been violated, but is sensitive to the First Amendment rights implicated by the seizure in this case. Accordingly, Multi–Media's motion for an immediate return of its property is **DENIED;** a hearing is ordered for December 13, 1993 to determine the obscenity of the seized materials pursuant to *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973).

### I. *Background.*

On May 10, 1993, United States Postal Inspector Gary Kinney applied for a warrant to search Multi–Media's Merrillville, Indiana facility and to seize various items, including the magazines and video cassettes at issue here. In his affidavit in support of his application, Kinney stated that, in February, 1993, he interviewed two Kentucky residents who had received unwanted advertisements from Multi–Media *via* the U.S. Mail. The advertisements promoted graphically sexual magazines and video cassettes that the residents found objectionable.

Both Kentuckians asked that the advertisements no longer be delivered to their homes. Meanwhile, Kinney initiated an investigation of Multi–Media. The materials sent by Multi–Media, which bore the name "Leisure Concepts" or "Leisure Time Products", included business reply envelopes and order forms. Kinney, utilizing a pseudonym, used these forms on several occasions to order sexually explicit materials. After reviewing the magazines and video cassettes he received from these orders, Kinney concluded that probable cause existed that Multi–Media was violating 18 U.S.C. § 1461, which prohibits mailing obscene matter.[1]

---

1. 18 U.S.C. § 1461 states, in relevant part:

 Every obscene, lewd, lascivious ... article, matter, [or] thing ...

Kinney applied for, and received, a warrant to search Multi–Media's Merrillville, Indiana facility. His affidavit describes the advertisements for, and his observations of, the thirteen video cassettes he had ordered. It also describes his observations of the nine magazines he had ordered. Two of the video cassettes were themselves "Video Catalogues," which consisted of scenes from seventy-nine other video cassettes that could be ordered from Multi–Media.

On the basis of Kinney's affidavit, the Magistrate Judge issued a search warrant that authorized the seizure of:

- two additional copies of each of the thirteen video cassettes described in Kinney's affidavit,
- two additional copies of each of the nine magazines described in Kinney's affidavit,
- two copies of each of the video cassette titles depicted in the "Video Catalogues,"
- business records, which might include a copy of Multi–Media's customer list.

The video cassettes and magazines were all identified by title.

The warrant was executed on May 13, 1993. Postal inspectors seized two copies each of eighty-six video cassettes and two copies of all nine of the magazines. They also seized a copy of Multi–Media's customer list for the area encompassing the western judicial district of Kentucky.

To date, Multi–Media has not been indicted in connection with these materials. As stated, Multi–Media has brought this action to secure the materials' return utilizing FED. R.CRIM.P. 41(e).

## II. *Jurisdiction.*

This case presents a relatively rare procedural animal and the court first reviews the fact and form of its jurisdiction over Multi–Media's motion. Rule 41(e) states as follows:

> A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person in entitled to lawful possession of the property.

Rule 41(e), although a rule of criminal procedure, has been held to support an independent equitable action for return of property even in the absence of any criminal proceeding. *See, e.g., In re Search of Kitty's East,* 905 F.2d 1367, 1370 (10th Cir.1990) ("[E]ntertaining a preindictment Rule 41(e) motion is an exercise of equitable jurisdiction...."); *White Fabricating Co. v. United States,* 903 F.2d 404, 407–08 (6th Cir.1990) (Refusing to adopt *"per se"* rule, but acknowledging that "assumption of equitable jurisdiction is warranted under equitable standards in this particular case."); *Pieper v. United States,* 604 F.2d 1131, 1133 (8th Cir.1979) ("[T]he District Court's equitable jurisdiction to suppress illegally obtained evidence before an indictment has been issued has been firmly established.") The court thus treats Multi–Media's motion as a civil action invoking the court's equitable powers.

█ This jurisdiction must be exercised with "caution and restraint." *In re Search of Kitty's East,* 905 F.2d at 1370; *White Fabricating Co.,* 903 F.2d at 408. Prudence is required because preindictment orders to return property inevitably involve the court in the prosecutorial process, since an order to return seized evidence may strip the prosecution of its only basis for going to the grand jury. That caution notwithstanding, this case, involving the seizure of materials presumptively protected by the First Amendment, *see Maryland v. Macon,* 472 U.S. 463, 468, 105 S.Ct. 2778, 2781, 86 L.Ed.2d 370

Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section ... to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $10,000 or imprisoned not more than five years, or both....

(1985); *United States v. Levinson*, 991 F.2d 508, 509–10 (9th Cir.1993), commands that jurisdiction be exercised, *see In re Search of Kitty's East*, 905 F.2d at 1371.

### III. *The Fourth Amendment Claims.*

Multi–Media argues that the seizure of the video cassettes, magazines, and customer list was unlawful under the Fourth Amendment to the United States Constitution.[2] The Fourth Amendment protects the people from "unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation. . . ." U.S. CONST. amend IV. Multi–Media argues that Kinney's affidavit was insufficient to provide the Magistrate Judge with probable cause that it was violating 18 U.S.C. § 1461.

█ "[A]n application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." *New York v. P.J. Video*, 475 U.S. 868, 875, 106 S.Ct. 1610, 1615, 89 L.Ed.2d 871 (1986). Thus, the Magistrate Judge's task is " 'simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that . . . evidence of a crime will be found in a particular place.' " *Id.* at 876, 106 S.Ct. at 1615 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Review of a Magistrate Judge's probable cause determination is limited to whether he or she had a "substantial basis" to find as he

or she did. *Id.* The Fourth Amendment question before the court, therefore, is whether Kinney's affidavit provided a substantial basis from which the Magistrate Judge could find probable cause that obscene material was being knowingly sent by Multi–Media from Merrillville *via* the United States mail. A critical element of that conclusion was whether the affidavit provided a substantial basis to find probable cause that the listed video cassettes and magazines were obscene materials.

█ It is horn-book law that "a warrant authorizing the seizure of materials presumptively protected by the First Amendment may not issue based solely on the conclusory allegations of a police officer that the sought-after materials are obscene." *See P.J. Video*, 475 U.S. at 874, 106 S.Ct. at 1614. Rather, supporting affidavits must set forth sufficient facts to allow the Magistrate Judge to " 'focus searchingly on the question of obscenity.' " *Id.* (citation omitted). The answer to the question of obscenity, in turn, must be found with reference to the following questions:

(a) whether the "average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently descriptive way, sexual conduct . . ., (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973).[3]

---

2. Multi–Media discusses the seized magazines in its motion, but not in its memorandum in support of the motion. The court's analysis applies equally to the magazines.

3. Multi–Media argues that the Magistrate Judge could not have properly applied the first *Miller* prong because Kinney's investigation concerned distribution of the materials in the area encompassing the western judicial district of Kentucky and the Magistrate Judge's knowledge of community standards is limited to the area encompassing the northern judicial district of Indiana.

The United States Court of Appeals for the Ninth Circuit recently rejected a similar argument. See *United States v. Levinson*, 991 F.2d 508, 510 (9th Cir.1993). *Levinson* involved a seizure from a California pornography distribu-

tor charged with, *inter alia,* violation of 18 U.S.C. § 1461 by mailing obscene materials to Las Vegas, Nevada. *Id.* The defendants challenged a Los Angeles magistrate's ability to make an obscenity determination because, they argued, Nevada community standards applied. *Id.* The court disagreed. It recognized that since "[m]ailing or shipping contraband are crimes committed as much at the start of shipment in interstate commerce as by the arrival of the contraband in another state" that the magistrate's determination of obscenity based on the community standards of the originating state was entirely proper. *Id.* Regardless of where prosecution is contemplated, *id.,* the Constitution only requires that the defendant "be free of unreasonable seizure . . . in the forum in which the suspected violations and the seizure occurred," *id.*

Multi–Media challenges the basis for the Magistrate Judge's probable cause determination concerning the obscenity question on the grounds that: (1) the Magistrate Judge did not himself view the thirteen video cassettes attached to the affidavit[4]; (2) Kinney's descriptions of those thirteen video cassettes were insufficient; and, (3) Kinney's affidavit does not describe the other seventy-nine video cassettes listed in the warrant, *i.e.* the titles lifted from the video catalogs.

The first of these arguments is easily disposed of: a Magistrate Judge need not personally view allegedly obscene material prior to issuing a warrant authorizing its seizure where "a reasonably specific affidavit describing the content of a film generally provides an adequate basis ... to determine whether there is probable cause to believe that the film is obscene." *P.J. Video*, 475 U.S. at 874 n. 5, 106 S.Ct. at 1614 n. 5. Thus, Multi–Media's argument that the Magistrate Judge should have viewed the tapes folds into its argument attacking the sufficiency of Kinney's descriptions of the tapes in his affidavit.

Multi–Media argues that Kinney had to describe

> *each* of the films in their [sic] *entirety* — not just the sex acts portrayed in the film. The description furnished to the Magistrate must include the theme, the plot, the setting and the sexual activity, so that the judicial officer can evaluate the materials under the obscenity test established in *Miller v. California*, 413 U.S. 15, 24 [93 S.Ct. 2607, 2615, 37 L.Ed.2d 419] (1973).

Multi–Media overstates the specificity required in affidavits of this sort, while understating the information before the Magistrate Judge.

■ As noted, *P.J. Video* requires only that the Magistrate Judge be provided with a "general" description of a film's content. 475 U.S. at 874 n. 5, 106 S.Ct. at 1614 n. 5.

While it is true that Kinney's descriptions are not as lengthy as the ones appended to the Supreme Court's decision in *P.J. Video*, 475 U.S. at 882–884, 106 S.Ct. at 1618–1619 the Magistrate Judge could reasonably have concluded that the reason for this was because there was considerably less substance to these films. Multi–Media's own advertisements, included in Kinney's affidavit, describe the video cassettes at issue simply by the number of scenes in which various sex acts are carried to completion. For example, Multi–Media describes the video cassette entitled "Girls Who Eat Cum" as "three intense dick-sucking scenes, all ending in squirty, oral cum shots." Other cassettes are described with like starkness. In this context, Multi–Media's complaint that Kinney focused too exclusively on the sex scenes in the video cassettes approaches frivolousness. Multi–Media does not suggest what elements of plot or theme Kinney omitted. Furthermore, Kinney swore that the tapes have "no story line and limited dialogue" and feature "[c]ontinuous explicit sexual activity and graphic display of the genitals." Taken with their titles, and the "XXX" rating Multi–Media ascribed to them, the Magistrate Judge had ample basis to conclude that there was a fair probability that the video cassettes at issue were obscene. See *id.* at 877–78, 106 S.Ct. at 1616 (Focus is on whether there was a "substantial chance" not an "actual showing" of obscenity).

With regard to the video cassette titles gleaned from the video catalogs and listed in the warrant, but not described or previewed by Kinney, Multi–Media argues that the seizure of these tapes was "clearly unlawful." Multi–Media states that "[s]ince none of the 79 films were exhibited to the Magistrate and because he had no descriptions of those video cassettes, Multi–Media is entitled to their immediate return." Again, Multi–Media

---

at 511. The court adopts the Ninth Circuit's approach in this regard and rejects Multi–Media's challenge to the competency of the Magistrate Judge to apply *Miller* to the warrant application in this case.

4. Multi–Media calculates that the Magistrate Judge did not consider the warrant application for a long enough time period to have reviewed the thirteen video cassettes, which were attached to the application as exhibits. The court proceeds assuming, *arguendo,* that the Magistrate Judge did not view the tapes. The court makes no finding in this regard.

overstates what was required to support this seizure.

■ The law does not require officers seeking a warrant to seize allegedly obscene materials to purchase every magazine, movie, or videotape that they have probable cause to believe is obscene. *See Sequoia Books, Inc. v. McDonald,* 725 F.2d 1091, 1093–94 (7th Cir.1984). There is no requirement that officers previously examine each item to be seized. *See Sequoia Books, Inc.,* 725 F.2d at 1094; *Supreme Video, Inc. v. Schauz,* 808 F.Supp. 1380, 1391 (E.D.Wis.1992). *Sequoia Books* approved of a warrant supported by a description of nine allegedly obscene magazines that authorized seizure of copies of those nine in addition to others that had neither been previewed nor identified by the applying officer but that contained described acts. *Sequoia Books, Inc.,* 725 F.2d at 1093; see also *In re Search of Kitty's East,* 905 F.2d at 1371–74 (upholding warrant based on description of eighteen video cassettes that authorized seizure of similar materials that depicted named acts). The primary concern in these cases was that the discretion of the officers executing the warrants be sufficiently constrained. "[T]he whole purpose underlying the procedural safeguards [required by the Fourth Amendment] is to ensure that police officers do not seize First Amendment material based upon their own *ad hoc,* discretionary determinations of what is obscene and what is not." *Supreme Video,* 808 F.Supp. at 1393 (citing *Sequoia Books* and *In re Search of Kitty's East* ).

■ In this case, the postal inspectors executing the search warrant at Multi–Media were allowed no room for discretionary, *ad hoc* determinations. The warrant specified particular titles that could be seized. The determination that there was probable cause to seize these items was formed by the Magistrate Judge on the basis of Kinney's affidavit. The affidavit described the "Video Catalogs" from which these titles were obtained:

The first catalog is Item No. VCT9 "Interracial An[d] All Black Catalog".... [T]he first thirty-one previews feature known actors who are named. In the next twenty-eight previews the actors are not named.

Each preview depicts two or more persons engaged in one or more of the following: fellatio, vaginal intercourse, anal intercourse, cunnilingus, ejaculation, masturbation and finger insertion into the vagina. Some of these previews run for as little as five to ten seconds.

The second video catalog is Item No: VCT10 "Gay and Bi–Sexual" ... which contains twenty previews and runs approximately thirty minutes.... The actors are not named and each preview depicts two or more person engaged in one or more of the following: masturbation, fellatio, ejaculation, anal and vaginal intercourse, anal licking, anal insertion of a finger, cunnilingus and anal insertion of a dildo.

Multi–Media advertised these catalogs as "[e]xplicit" and it was reasonable for the Magistrate Judge to conclude that the excerpts that Multi–Media chose to highlight in them represented the essence of the catalogued tapes. The advertised description of the video catalogs and Kinney's description of them, made in the context of the tapes Kinney in fact ordered and described, provided probable cause—*i.e.,* a "substantial chance," *see P.J. Video,* 475 U.S. at 877–78, 106 S.Ct. at 1616—that the video cassettes "previewed" in the catalogs were themselves obscene. The possibility that this "substantial chance" was not, in fact, realized with regard to some, or even all, of the seized tapes does not defeat the lawfulness of the warrant here. *See Sequoia Books, Inc.,* 725 F.2d at 1094 ("The slight possibility of a temporary suppression of constitutionally protected sex magazines [or video cassettes] is not enough to invalidate the warrant under the Fourth Amendment.") The bottom line is this: (1) the Magistrate Judge had a substantial basis from which to find probable cause that the tapes depicted in the video catalogs were obscene, and, (2) the Magistrate Judge properly restricted the discretion of the executing officers.

■ Multi–Media also challenges the Magistrate Judge's basis for finding probable cause to authorize the seizure of its customer list for those customers residing in the west-

ern judicial district of Kentucky.[5] Multi–Media asks "[w]here could there possibly be any showing that 17,000 names and addresses of Multi–Media customers were involved in criminal activity?" The answer to that question is found in this court's holding that the Magistrate Judge had a substantial basis to find probable cause that the materials ordered by Kinney from Multi–Media's mail-order forms were obscene. It is only a short step from that holding to the conclusion that there is a substantial chance that customers receiving Multi–Media's mail-order forms had received obscene materials in the U.S. mails using those forms. *See P.J. Video,* 475 U.S. at 877–78, 106 S.Ct. at 1616 (Focus in reviewing a Magistrate Judge's finding of probable cause is on the Magistrate Judge's basis for concluding that there was a "substantial chance," not an "actual showing," that criminal activity was afoot.) Accordingly, seizure of the copy of Multi–Media's customer list was appropriate.

## IV. *The First Amendment Issues.*

 Notwithstanding the legality of the May 13, 1993 search at Multi–Media's Merrillville facility, the seizure in this case raises important First Amendment issues.[6] The tapes and magazines seized from Multi–Media in Merrillville are presumptively protected under the First Amendment. *See Macon,* 472 U.S. at 468, 105 S.Ct. at 2781; *Levinson,* 991 F.2d at 509–10. While *P.J. Video* held that the First Amendment aura surrounding such materials demands no "higher standard" of probable cause under the Fourth

Amendment, 475 U.S. at 874, 106 S.Ct. at 1614, a "prompt judicial determination of the obscenity issue in an adversary proceeding" is required, *Heller v. New York,* 413 U.S. 483, 492, 93 S.Ct. 2789, 2795, 37 L.Ed.2d 745 (1973). No such determination has been made thus far in this case. Before considering the practical consequences of this fact, however, the court turns to the First Amendment interests raised by Multi–Media but *not* implicated in this case.

 Multi–Media argues that the United States' seizure and retention of the video cassettes and magazines in this case constitute an unconstitutional prior restraint on speech. It argues that

> the distribution of all 92 films named in the warrant has ceased and, thus, a critical prior restraint has been imposed on their circulation throughout the United States. In addition, there has been no distribution of any films or books to the 17,000 customers in the Western District of Kentucky since the time their names were seized. This circumstance is constitutionally intolerable under the solemn ideologies of the First Amendment.

The seizure of only two copies of each of the video cassettes named in the warrant does not amount to a prior restraint. *See In re Grand Jury Subpoena,* 829 F.2d 1291, 1298–99 n. 9 (4th Cir.1987); *Supreme Video,* 808 F.Supp. at 1397–98 (no prior restraint absent showing that *all* copies of relevant videos were seized).[7] The law is clear that "a single

---

5. In a footnote to its motion, Multi–Media acknowledges that the total number of customer names and addresses seized was 16,414. Nonetheless, throughout the text of its motion and in its supporting memorandum Multi–Media refers to the "17,000" and "over 17,000" names and addresses seized. The court strongly disapproves of this hyperbole.

6. Rule 41(e) was amended in 1989 so that it applies to persons "aggrieved by an unlawful search or seizure *or by the deprivation of property.*" 124 F.R.D. 397, 426–27 (1989) (Emphasis added). So amended, Rule 41(e) provides for "a person whose property has been lawfully seized" to "seek return of property when aggrieved by the government's continued possession of it." *Id.* To the extent Multi–Media is aggrieved by impingement on its First Amendment rights, it

remains an aggrieved party in the meaning of Rule 41(e).

7. Footnote 9 of *In re Grand Jury Subpoena* reads:
> The government sought only one copy of every requested tape. This distinguishes this case from those cases involving massive seizures of books that amounted to prior restraint. The "substantial restraint" that a party must prove in order to invoke the nearly absolute prohibition against pre-publication hindrances is absent from these cases.

829 F.2d at 1298–99 n. 9 (citations omitted). Incredibly, Multi–Media cites this footnote for the proposition that "subpoenaing even one copy of a film 'is plainly a form of prior restraint.'" The internal quote is taken out of context from another case cited in the footnote: *i.e. Roaden v. Kentucky,* 413 U.S. 496, 504, 93 S.Ct. 2796,

copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause" so long as the book or film is "not taken out of circulation completely." *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 63, 109 S.Ct. 916, 927, 103 L.Ed.2d 34 (1989); *Heller,* 413 U.S. at 492, 93 S.Ct. at 2794–95. The same reasoning applies where two copies are seized.

 Multi–Media, pointing to the alleged fact that it has not sold copies of the titles seized since the execution of the warrant, claims that it has been prevented from continuing to sell tapes seized. Compare *Heller,* 413 U.S. at 492, 93 S.Ct. at 2794–95 ("[T]here is no showing or pre-trial claim that the seizure of the copy prevented continuing exhibition of the film.") Multi–Media has not, however, been compelled to discontinue distribution of the seized titles. It has chosen that course. Toleration of a risk of prosecution is the burden borne by all who traffic in sexually explicit materials that test the limits of the First Amendment. *Eckstein v. Cullen,* 803 F.Supp. 1107, 1113 (E.D.Va. 1992). In upholding Indiana's antiobscenity laws, which closely trek *Miller,* the Supreme Court stated that

> deterrence of the sale of obscene materials is a legitimate end of ... antiobscenity laws, and our cases have long recognized the practical reality that "any form of criminal obscenity statute applicable to a bookseller will induce some tendency to self-censorship and have some inhibitory effect on the dissemination of material not obscene." The mere assertion of some possible self-censorship resulting from a statute is not enough to render an antiobscenity law unconstitutional under our precedents.

*Fort Wayne Books,* 489 U.S. at 60, 109 S.Ct. at 926 (citations omitted). In like manner,

the seizures here, regardless of whether they induced self-censorship by Multi–Media, are not thereby rendered unconstitutional.

 The First Amendment nonetheless lingers as an issue in this case. The First Amendment requires that a limited seizure of presumptively First Amendment-protected materials entitles interested parties, upon request, to a "prompt [postseizure] judicial determination of the obscenity issue in an adversary proceeding." *Heller,* 413 U.S. at 492, 93 S.Ct. at 2795. *Heller* is clear that judicial determination of obscenity need not await trial where a defendant makes the appropriate pre-trial motion. *See id.,* 413 U.S. at 490–91, 93 S.Ct. at 2793–94 ("In this case, the barrier to a prompt judicial determination of the obscenity issue in an adversary proceeding was not the State, but petitioner's decision to waive pre-trial motions and reserve the obscenity issue for trial"). Multi–Media's Rule 41(e) motion does not express an awareness of Multi–Media's right to a postseizure obscenity determination under *Heller.* Nonetheless, where a Rule 41(e) motion clearly questions the seizure of allegedly obscene materials on First Amendment grounds, it is appropriate to treat that motion as one for a *Heller* hearing. *Cf. Supreme Video,* 808 F.Supp. at 1396 (citing Rule 41(e) as federal procedure by which to request *Heller* hearing).

The court finds that Multi–Media is entitled to a prompt *Heller* hearing. There can be no other conclusion. The government has seized and retained copies of presumptively First Amendment protected materials without a judicial determination of their obscenity. The premise of the *Heller* decision is that "First Amendment rights do not vanish completely in the absence of prior restraint." *See In re Grand Jury Subpoena,* 829 F.2d at 1299. Multi–Media's lingering First Amend-

---

2801, 37 L.Ed.2d 757, which states that *"without the authority of a constitutionally sufficient warrant,* [seizure] is plainly a form of prior restraint."* (Emphasis added).

Counsel for Multi–Media's zeal for their client's position is reflected by the repeated use of underlining and exclamation in their brief. That is all well and good. Zeal must, however, be tempered by candor to the court. Rule 11 of the Federal Rules of Civil Procedure states that when an attorney signs a pleading he or she

swears to its being well-founded in fact and law. Counsel is obligated to make reasonable inquiry into whether a pleading he or she signs is well-founded. *See Pantry Queen Foods v. Lifschultz,* 809 F.2d 451, 454 (7th Cir.1987). Even ascribing pure motives to counsel in this matter, any inquiry at all would have revealed that its citation to *In re Grand Jury Subpoena* treated black as white. Misrepresentation of citation is clearly grounds for Rule 11 sanction. The court's public condemnation serves as its sanction in this case.

ment rights cannot be allowed to languish. As recognized at the outset, this case requires the court to forge the difficult strait between "the Scylla of interfering with the prosecutorial process" and the "Charybdis ... of undue inhibition of ... the exercise of ... First Amendment rights." *Ricciardi v. Thompson*, 480 F.2d 167, 170 (7th Cir.1973). Here, that course requires that Multi–Media receive a full, prompt adversarial hearing on the obscenity issue.

 "Promptness", under *Heller*, must be measured from the time of the request for a hearing, not from the time of the seizure. *See Piepenburg v. Cutler*, 649 F.2d 783, 790 (10 Cir.1981) (request is the determining event). *Heller* stated that "[b]y 'prompt,' we mean the shortest period 'compatible with sound judicial resolution,'" 413 U.S. at 492 n. 9, 93 S.Ct. at 2795 n. 9; however, the Supreme Court "refrained from establishing rigid, specific time deadlines in proceedings involving seizure of allegedly obscene material." *Id.*, 413 U.S. at 490, 93 S.Ct. at 2794. Multi–Media's Rule 41(e) motion, was fully-briefed as of September 9, 1993. The soonest date the court's calendar allows for this hearing is December 13, 1993. The hearing is hereby set for that date at 8:30 a.m.

What is required at a *Heller* hearing has not been defined other than that it requires "a 'judicial determination of the obscenity issue in an adversary proceeding.'" *Fort Wayne Books*, 489 U.S. at 63, 109 S.Ct. at 927 (quoting *Heller*, 413 U.S. at 492–493, 93 S.Ct. at 2794–95). The court expects the parties to fully litigate the obscenity issue for each of the seized video cassettes and magazines. In ruling, the court will apply the community standards of the area encompassing the northern judicial district of Indiana.

*See Levinson*, 991 F.2d at 510. The court will view the materials, accept relevant testimony, and hear argument. The parties are ordered to file proposed findings of fact and conclusions of law no later than November 29, 1993. *See* Rule 21(f) of the General Rules for the United States District Court, Northern District of Indiana.[8]

**SO ORDERED.**

---

8. Multi–Media also raises First Amendment arguments with regard to the seizure of the copy of its customer list. In this regard, both Multi–Media and the United States cite cases that discuss subpoena of customer lists and other business records by grand juries investigating possible distribution of obscene materials. Courts must, indeed, be wary of the chilling effect that could result from unchecked grand jury fishing expeditions led by prosecutors hostile to particular forms of protected expression. *See In re Grand Jury 87–3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir.1992). That is, however, not the case here. As held above, the Magistrate Judge had a substantial basis to find probable cause that these names were connected to criminal activity. As with the video cassettes and magazines, the chilling effect acknowledgedly associated with seizure of the customer lists, see *id.* at 232, was outweighed by the need for criminal investigation. Also as with the tapes and magazines, some chill lingers and resolution of the obscenity issue at the December 13, 1993 hearing will be dispositive concerning the return of the copied customer list.